2026 IL App (1st) 250892-U
No. 1-25-0892

SIXTH DIVISION
August 7, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| DEMEATRICE BAUGHNS and AMAZING GRACE, INC., | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 2019 CH 14517 |
| GOD BE GLORIFIED, INC., CHARLES HILSON, and DAPHNEY HILSON, | ) ) ) | |
| Defendants. | ) ) | The Honorable Caroline Kate Moreland, |
| (God Be Glorified, Inc. and Daphney Hilson, defendants-appellees). | ) ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Hyman and Justice Gamrath concurred in the judgment.

**ORDER**

*Held*:     We reverse the entry of summary judgment in favor of the defendants because issues of fact precluded application of promissory estoppel to enforce the release of the underlying loan.

¶ 1        Plaintiffs Demeatrice Baughns and Amazing Grace, Inc. (Amazing Grace) appeal from the circuit court order that granted summary judgment to defendants God Be Glorified, Inc., (GBG) and Daphney Hilson. For the following reasons, we reverse and remand.

¶ 2                                    I. BACKGROUND

¶ 3        This action concerns plaintiffs' 2014 loan to defendant-appellee GBG, an insurance brokerage, as well as instruments executed in 2015 that allegedly relieved GBG of that debt. Three individuals are at the center of these transactions: defendant Charles Hilson (Charles) and two of his former spouses: defendant-appellee Daphney Hilson (Daphney) and plaintiff-appellant Demeatrice Baughns.

¶ 4        Two corporate entities are at issue: GBG (as borrower) and Amazing Grace (as lender) . Charles and Daphney were the only officers and co-owners of GBG until 2015, after which Daphney became full owner. Plaintiff Baughns was not an owner or officer of GBG.

¶ 5        The record shows that Amazing Grace was formed by Charles and Baughns in 2014 for the purpose of facilitating a loan to GBG funded by Baughns. Although the record is not entirely clear, it indicates that Charles and Baughns were the sole owners and officers of Amazing Grace during the transactions at issue.  Importantly, however, Charles executed certain transactions on behalf of Amazing Grace without Baughns' knowledge.

¶ 6                    Baughns Funds a 2014 Loan from Amazing Grace to GBG

¶ 7        As of 2014, Charles was the chief executive officer and 51% owner of GBG. Daphney, Charles' former wife, was GBG's president and 49% owner. Charles was married to Baughns during the relevant transactions at issue in this case.[1] There is no dispute that, at her husband's

---

[1] Charles and Baughns were married between June 2000 and February 2019.

request, Baughns used her personal savings to fund a loan to help preserve GBG as a viable business.

¶ 8        As alleged in the operative complaint, GBG obtained insurance coverage with insurers on behalf of GBG customers. Premiums paid by customers to GBG were deposited into a "premium trust account," from which GBG was required to pay the insurers who issued coverage. GBG was entitled to retain a portion of the payments as commissions.

¶ 9        Around 2014, GBG experienced a "cash shortage" because it withdrew funds from the trust account in excess of the amounts GBG was entitled to receive as commissions. This raised the risk that GBG would not be able to make payments due to underlying insurance carriers, which could trigger action by the Illinois Department of Insurance.

¶ 10       The record shows that Charles consulted with an attorney for advice as to how to fund a loan to GBG to keep it in business without informing Daphney. In a letter to Charles dated September 23, 2014, the attorney stated:

> "As you explained the situation to us, GBG is in need of a cash infusion of about $275,000 within the next week or so. As CEO and majority shareholder, you are extremely concerned about the survivability of GBG. * * * We further understand that you anticipate the minority shareholder [Daphney] would not be cooperative in any effort to fund the shortfall. Your wife Demeatrice [Baughns] has proposed providing the required cash."

The attorney suggested that Charles' wife, Baughns, could "make[] a loan to GBG through another entity such as a corporation or trust so that her identity is not revealed."

¶ 11    As detailed in Baughns' affidavit, Charles asked Baughns (his then-wife) to fund a loan to keep GBG in business. Baughns agreed. In September 2014, she withdrew approximately $272,000 from her 401(k) retirement account. She calculated that, after accounting for an early withdrawal penalty and taxes, she would be left with $219,000 that she could use to fund the loan. Based on these calculations, she transferred $219,000 to her husband's checking account. Documents show that Charles received that wire transfer on October 9, 2014. Shortly thereafter, Charles deposited that amount into GBG's business checking account.

¶ 12    Charles did not want Daphney to discover that the source of the loan was his current wife, Baughns. As alleged by plaintiffs, Charles and Baughns formed a new corporation, Amazing Grace, for the purpose of making the loan.[2] Amazing Grace was identified as the lender on the 2014 loan documents.

¶ 13                                2014 Loan Documents

¶ 14    In October 2014, GBG (through Charles) executed a promissory note in favor of Amazing Grace in the principal amount of $272,779, with interest on the unpaid principal balance at a fixed per annum rate of 4%. The promissory note was signed by Charles, as GBG's "C.E.O."

¶ 15    The note called for payment in fifty-five equal monthly installments, beginning November 2014. It also specified that any event of default made the note immediately due and payable.

¶ 16    The note recited that it was "secured by a Security Agreement of even date." Charles, in his capacity as GBG's CEO, executed a Security Agreement giving Amazing Grace an interest in GBG's assets. On October 14, 2014, a corresponding UCC Financial Statement was filed with the Illinois Secretary of State identifying Amazing Grace as a secured party.

---

[2] The record does not contain documentation reflecting the precise formation date, ownership or officers of Amazing Grace.

¶ 17    Charles executed a personal guaranty of GBG's loan obligations to Amazing Grace pursuant to the 2014 promissory note.

¶ 18                    GBG Defaults on the 2014 Loan

¶ 19    GBG made a number of monthly payments, but it defaulted on the March 2015 monthly payment and subsequent payments.

¶ 20            Daphney and GBG Seek a Third-Party Loan to Facilitate Daphney's Buyout of
                                    Charles' Interest in GBG

¶ 21    In 2015, Daphney (who already held a 49% interest in GBG) desired to purchase Charles' 51% ownership interest. In May 2015, Charles and Daphney executed an agreement calling for Daphney to purchase Charles' 51% interest in GBG for $250,000.

¶ 22    Around the same time, Daphney approached Newtek Small Business Finance, LLC (Newtek) to obtain a loan to GBG to fund the purchase of Charles' 51% interest. In its due diligence, Newtek became aware of the 2014 promissory note and security agreement executed by GBG in favor of Amazing Grace. According to Daphney, she was not previously aware of the 2014 loan from Amazing Grace to GBG.

¶ 23    On May 19, 2015, Charles sent a letter to Newtek dated May 19, stating that he agreed to sell his ownership in GBG to Daphney. He also stated "I agree to transfer the ($210,431) debt of Amazing Grace from GBG Inc. to me personally."

¶ 24    In June 2015, Newtek informed Daphney that it would loan $212,000 to GBG, subject to certain conditions related to the 2014 loan from Amazing Grace. Among these, Newtek specified that there must be a "transfer of debt in the amount of $210,431 from [GBG] to Charles Hilson," that Amazing Grace would release GBG from the debt, and that Amazing Grace would agree that

its security interest was subordinate to Newtek's. Newtek also required that Daphney personally guarantee the Newtek loan.

¶ 25     Charles—who had executed the 2014 loan documents on behalf of GBG as borrower—subsequently executed documents *on behalf of Amazing Grace* purporting to release GBG from its obligations under the loan. Notably, there is no dispute that Baughns was *not* made aware of these documents.

¶ 26     On August 5, 2015, Charles executed a Subordination Agreement on behalf of Amazing Grace in favor of Newtek. The Subordination Agreement specified that, as a condition of Newtek's loan to GBG, Amazing Grace agreed to subordinate its 2014 loan and related security interest in GBG's assets to Newtek's interest. However, the Subordination Agreement also stated:

> "Nothing contained in this agreement shall constitute a subordination of any indebtedness now or hereafter owing to Creditor [Amazing Grace] and this Agreement is solely intended to provide for subordination of Creditor's security interest in the assets only."

Daphney signed the Subordination Agreement on behalf of GBG. Charles signed on behalf of Amazing Grace as "CFO." It was not signed by Baughns.

¶ 27     On August 12, 2015, Charles, again signing on behalf of Amazing Grace, executed an "Assumption of Debt and Release" ( "ADR") in favor of GBG and Newtek. The ADR states in its entirety:

> "The Undersigned hereby confirms and acknowledges to Amazing Grace (creditor) that the undersigned is indebted to the Creditor in the amount of $210,431 as of the date hereof, which the amount is

due and owing and includes all accrued interest and other permitted charges to date. GBG, Inc[.] will be released from any liability of this debt."

¶ 28     Charles signed the ADR on two separate signature lines: once under his own name, and again on a signature line for Amazing Grace. Michael-Charles, the son of Charles and Daphney, also signed the ADR as a witness.

¶ 29     Baughns did not sign the ADR. The parties do not dispute that Baughns had no knowledge of the ADR or the Subordination Agreement when Charles signed them on behalf of Amazing Grace.

¶ 30     At his deposition in this case, Charles testified that he did not know who prepared the ADR document. He testified as follows about his understanding when he signed it:

"Q.  But the [2014] note was signed by you on behalf of God Be Glorified?

A. Right.

Q. So God Be Glorified always owed that money to Amazing Grace, but you were the underlying guarantor?

A. I understand.

Q. But this [is] an Assumption of Debt * * * the last sentence says, 'GBG, Inc. will be released from any liability of this debt.' Why were you doing that?

A. I would not have done that. The only reason I would have done that is that the loan broker was trying to get as clean a loan as he can through SBA [Small Business Administration]. * * * So, again, I

don't doubt that it is my signature. *Let me be clear that I never intended for Amazing Grace or Dee Baughns not to be paid the money that kept us in business* so that we can be sitting here today."

(Emphasis added).

Charles also testified at the deposition that "either Amazing Grace was going to be repaid in my understanding or I would not have signed this agreement."

¶ 31      According to defendants, through the ADR, Charles personally assumed the debt owed to Amazing Grace, and GBG was released from any liability to plaintiffs from the 2014 loan.

¶ 32      *After the Newtek Loan, Daphney Becomes Sole Owner of GBG*

¶ 33      Pursuant to a note dated August 20, 2015, Newtek lent $212,000 to GBG. Daphney personally guaranteed the Newtek loan. According to her affidavit, Daphney also placed a second mortgage on her principal residence to secure that loan. Daphney averred that she would not have guaranteed the Newtek loan without the ADR. Charles subsequently transferred his 51% ownership of GBG to Daphney.

¶ 34      *In 2019, GBG Acknowledges the Outstanding Debt to Plaintiffs*

¶ 35      On September 18, 2019, Baughns sent an email to Daphney, who was GBG's president and CEO, with the subject line "GBG Inc. Outstanding Debt ($272,000) to AMG INC." Baughns cited the 2014 note and security agreement and asserted that GBG was in default under the loan from Amazing Grace. Baughns demanded payment of all principal and accrued interest and threatened legal action. Baughns attached a spreadsheet showing a balance due of $278,059.21.

¶ 36      The following day, September 19, Daphney responded to Baughns by email. Daphney did not dispute the debt but stated that "GBG will start making payment directly to you."

¶ 37    On September 30, 2019, Michael-Charles, writing as vice president of GBG, sent a letter to Baughns with the subject line: "GBG, Inc Outstanding Debt of $278,059.21 to Amazing Grace, Inc." He told Baughns: "Please accept this letter as a professional apology and written confirmation that (*) [sic] GBG, Inc. will begin to repay the above noted amount." He indicated that GBG would pay a first installment on October 19, 2019 and would make additional payments "every month until the balance is paid in full." Michael-Charles said: "I appreciate your support of [GBG] and look forward to compensating you in full for your investment in our business."

¶ 38    On November 8, 2019, Baughns' attorney sent a letter to Daphney, demanding full payment of the balance due on the 2014 promissory note. After the demand letter, Michael-Charles mailed four checks made out to Baughns, each in the amount of $500. Baughns was able to cash two of those checks. The third was returned for non-sufficient funds. Baughns' bank did not accept the final check.

¶ 39    Given the confusing nature of the transactions and the relationships of those involved, the following chronology may be helpful for reference:

| September 2014 | <ul><li>GBG faces a cash shortage. Baughns agrees to fund a loan to GBG at the request of Charles, her then-husband</li><li>Baughns withdraws $272,779.90 from her 401(k) retirement account. She calculates that, after reducing for an early withdrawal penalty, there will be $219,000 remaining to fund the loan</li></ul> |
|---|---|

| September 23, 2024 | • Charles consults with an attorney, who suggests that Baughns make the loan to GBG "through another entity" so that Daphney does not discover the source of the funds |
|---|---|
| September/early October 2014 | • Baughns and Charles create Amazing Grace for the purpose of serving as the lender to GBG (exact date unclear from the record) |
| October 1, 2014 | • GBG (as borrower) executes a promissory note in favor of Amazing Grace (lender) in the amount of $272,799.90<br>• GBG executes a security agreement in favor of Amazing Grace in conjunction with the loan<br>• Charles signs both documents on behalf of GBG |
| October 9, 2014 | Baughns transfers $219,000 to Charles' personal checking account |
| October 14, 2014 | Charles transfers $219,000 to GBG |
| May 2015 | Charles and Daphney agree that Daphney will purchase Charles' interest in GBG, making her sole owner |
| June 2015 | • GBG (through Daphney) seeks a loan from a third-party, Newtek<br>• Newtek agrees to loan to GBG only upon certain conditions, including release of GBG's debt to Amazing Grace |

| Early August 2015 | • Charles executes an "Assumption of Debt" on behalf of Amazing Grace purporting to release GBG of its debt to Amazing Grace.<br><br>• Charles executes a "Subordination Agreement" subordinating Amazing Grace's security interest to Newtek<br><br>• Baughns had no knowledge of these documents |
|---|---|
| August 20, 2015 | • Newtek loans $212,000 to GBG<br><br>• Daphney subsequently becomes sole owner of GBG |
| September 2019 | • Baughns writes to GBG and Daphney demanding repayment under the 2014 loan from Amazing Grace<br><br>• Daphney responds that "GBG will start making payment directly to you"<br><br>• GBG sends an "apology" to Baughns and promises to repay her |
| November 8, 2019 | • Baughns' attorneys demand payment of amounts due under the 2014 note |
| November-December 2019 | • GBG (through Michael-Charles Hilson) sends four separate checks of $500 each to Baughns |

¶ 40                               Commencement of This Action

¶ 41   This action commenced in December 2019, when Amazing Grace filed a complaint against GBG and Charles seeking to recover for breach of the 2014 note. Baughns and Daphney were not named as parties in the original complaint.

¶ 42   After GBG and Charles answered, the parties engaged in discovery. In interrogatory answers, GBG stated that Charles was "both the CFO of Plaintiff [Amazing Grace] as well as the CEO of Defendant God Be Glorified, Inc." at the time he executed the 2014 note, security agreement, and his personal guaranty. Elsewhere in those answers, GBG stated that Charles "lacked the corporate authority to sign the Note and Security Agreement" on behalf of GBG and alleged that "he was perpetrating a fraud against" GBG. GBG stated:

> "Defendant Charles Hilson occupied the position of CFO of Plaintiff Amazing Grace, Inc. while at the same time occupying the position of CEO of Defendant [GBG]. By contemporaneously occupying these two corporate officer roles in both the nominal lender and the nominal borrower, he was able to perpetuate his fraud, thus appearing to bind [GBG] with a debt it did not need * * * all in an effort to financially and legally sabotage [GBG] and more easily acquire its long-standing insurance brokerage clients as his own."

¶ 43   On September 21, 2020, GBG served requests for admission on Amazing Grace. Among these, it asked Amazing Grace to admit that Charles was Amazing Grace's chief financial officer as of August 2015 and that Charles had authority to execute the ADR and subordination agreement on behalf of Amazing Grace. Amazing Grace submitted its answer on October 23, 2020. This was outside the 28-day window to respond under Supreme Court Rule 216. Ill. S. Ct. R. 216 (eff. July 1, 2014). GBG moved to strike Amazing Grace's answers to the requests for admission and have

the facts deemed admitted. The court entered an order deeming facts admitted, concluding Amazing Grace had not shown good cause for late responses.

¶ 44        In January 2022, Amazing Grace filed an amended complaint that added Baughns as a plaintiff and joined Daphney and Michael-Charles as defendants along with GBG. It contained claims for breach of the promissory note against GBG (count I); breach of guaranty against Charles (count II); and foreclosure of Amazing Grace's lien on GBG's assets pursuant to the security agreement and UCC financing statement (count III). In Count IV, Amazing Grace sought a declaratory judgment that defendants were jointly and severally liable for the 2014 loan, citing a 2015 "Letter of Intent" agreement among Charles, Daphney, and Michael-Charles referencing the debt owed to Amazing Grace. In Count V, Amazing Grace alleged that it was the third-party beneficiary of the same Letter of Intent.

¶ 45        The first amended complaint pleaded that Baughns and Amazing Grace had no prior knowledge of the Newtek loan, subordination agreement, or the ADR. Plaintiffs asserted that Charles lacked "actual authority" to release GBG's obligations to Amazing Grace. Plaintiffs alleged that these documents were agreed to by Charles and Daphney without notice or payment of any consideration to Baughns or Amazing Grace.

¶ 46        In May 2022, Michael-Charles moved to dismiss counts IV and V of the first amended complaint. Daphney filed a motion for summary judgment. The court subsequently granted plaintiffs leave to file a second amended complaint.

¶ 47                                Second Amended Complaint

¶ 48        In June 2022, Baughns and Amazing Grace filed a second amended complaint. Like the prior pleading, it contained counts for breach of the note (count I); a count against Charles for breach of his guaranty of the note (count II),  a count seeking foreclosure of the security agreement

in favor of Amazing Grace (count III); a declaratory judgment count against all defendants(count IV); and a count for "breach of third-party beneficiary contract" (count V).

¶ 49    On June 23, 2022, Charles filed his answer to the second amended complaint. Charles admitted the factual allegations that Baughns transferred $219,000 of her personal funds, which money was used to allow GBG to stay in business.

¶ 50    In June 2023, GBG and Daphney filed their answer, as well as affirmative defenses and a counterclaim. The first affirmative defense claimed that the 2014 note was fraudulent. They alleged that Charles and Baughns used the Amazing Grace corporation to defraud GBG by claiming that Charles signed the note on behalf of GBG, but in fact he was "signing the note in his personal capacity, and either no funds were actually transferred" to GBG, or such funds were only controlled by Charles.

¶ 51    In a second affirmative defense, GBG and Daphney alleged that the 2014 note was null and void "for failure of consideration" because they never received the benefit of the funds that were subject of the note. GBG and Daphney's third affirmative defense was "estoppel and waiver" based on the subordination agreement executed by Charles in his capacity as an officer of Amazing Grace. The fourth affirmative defense was "Release and Satisfaction" based on the ADR signed by Charles in August 2015.

¶ 52    In October 2022, the court granted Michael-Charles' motion to dismiss the claims against him (counts IV and V).

¶ 53    The parties subsequently conducted depositions. Michael-Charles testified he witnessed his father sign the ADR in August 2015. Michael-Charles testified to his understanding that the document served to "release the lien," but that Baughns would still be paid back:

"Q. In other words, God Be Glorified wasn't being released of the debt, it's only the lien that was being released?

A. Right the lien was being released, and I told [Baughns] that I was going to make sure – I mean, that was her retirement money. And if it wasn't for her we wouldn't be in business."

¶ 54    In July 2023, GBG and Daphney filed an amended motion for summary judgment. Their primary argument was that the 2015 ADR signed by Charles on behalf of Amazing Grace was enforceable under the doctrine of promissory estoppel such that plaintiffs could not collect on the 2014 note. GBG and Daphney argued that the ADR met the elements necessary to prove promissory estoppel, including an unambiguous promise and reliance by GBG and Daphney that was expected and foreseeable.

¶ 55    Defendants argued that GBG and Daphney relied on the ADR by entering into the Newtek loan. They further alleged that Daphney relied by personally guaranteeing the Newtek loan, placing a mortgage on her home in favor of Newtek, and by executing a separate $100,000 promissory note to Charles as part of consideration for buying his 51% interest in GBG. They claimed this reliance was "expected and foreseeable by all the parties", because the ADR was signed by Amazing Grace. Notably, defendants did not suggest that Baughns had any prior knowledge of the ADR.

¶ 56    Elsewhere, Daphney and GBG argued that the 2014 note was unenforceable due to failure of consideration. They pointed out that the note refenced a principal amount of $272,779.90, whereas Baughns transferred only $219,000 to fund the loan. Elsewhere in the motion for summary judgment, GBG and Daphney asserted that the subordination agreement was valid and enforceable,

and that it placed Amazing Grace "in second place in line behind" Newtek until the Newtek loan was paid in full.

¶ 57    The motion for summary judgment urged that, pursuant to the trial court's July 26, 2021 order regarding the requests for admission, Amazing Grace was "deemed to have admitted that it signed the Assumption of Debt and Release which releases" GBG and Daphney from liability on the note and security agreement.

¶ 58    In November 2023, plaintiffs filed their response. In it, plaintiffs noted that GBG and Daphney did not dispute that plaintiffs funded $219,000 in connection with the 2014 note in order to save GBG. They argued that defendants could not rely on the ADR and promissory estoppel to avoid liability under the note because the ADR was unenforceable due to lack of consideration. Plaintiffs pointed out that the ADR (signed by Charles on behalf of Amazing Grace) recited no consideration or benefit that Amazing Grace received in return for releasing GBG of the debt from the 2014 note. Plaintiffs also pointed out that Charles had *already* assumed personal liability for Amazing Grace's note when he executed the 2014 guaranty.

¶ 59    Alternatively, plaintiffs urged that defendants should not be able to use the equitable doctrine of promissory estoppel to avoid liability as it would "would work a fraud or injustice" on plaintiffs. That is, they urged the doctrine should not be used by defendants as a means to avoid having to repay monies that plaintiffs "used to save [GBG]" in 2014. Plaintiffs noted that under the doctrine: " A promise which the promisor should reasonably expect to induce action or forbearance * * * on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Bank of Marion v. Robert 'Chick' Fritz, Inc.*, 57 Ill. 2d 120, 124 (1974) (quoting Restatement of Contracts, § 90 (1932)).

¶ 60        Plaintiffs argued that it would work a "fraud or injustice" to enforce the release in the ADR. Plaintiffs pointed out that Charles and Michael-Charles both testified that the $219,000 received from Baughns was necessary to allow GBG to stay in business. Plaintiffs emphasized that defendants' motion for summary judgment did not question the validity of the 2014 debt, but instead sought to enforce a purported release of that debt based solely on promissory estoppel.

¶ 61        Plaintiffs also argued that the promissory note was not rendered unenforceable due to lack of consideration. They noted the evidence that Baughns wired $219,000 for an "emergency cash infusion to save" GBG, such that GBG received a "significant benefit." Plaintiffs explained that the difference between the stated principal amount of the note ($272,770.90) and the $219,000 actually transferred "was the tax liability" calculated by Baughns' withdrawal of her retirement plan savings.

¶ 62        In their reply brief, GBG and Daphney maintained that the release executed by Charles was enforceable under the doctrine of promissory estoppel. They argued that reliance on the release was established by the Newtek loan and Daphney's personal guaranty of that loan, Daphney's mortgage on her residence, and Daphney's execution of a $100,000 note payable to Charles. Defendants maintained it was "obviously expected and foreseeable by all the parties" that GBG and Daphney would so rely on the ADR because its "whole purpose" was to allow GBG "to receive the Newtek Finance Loan."

¶ 63        On April 11, 2024, the trial court entered an order granting defendants' motion for summary judgment as to counts I and III, agreeing that the ADR was an enforceable release under the doctrine of promissory estoppel. Citing *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 233 Ill. 2d 46 (2009), the court recognized there are four elements to promissory estoppel: (1) an unambiguous promise; (2) reliance on the promise; (3) the reliance was expected and foreseeable;

and (4) the promisee relied on the promise to its detriment. The court commented that: "Plaintiffs argue that promissory estoppel has a fifth element and argue that Defendants must show that they relied to their detriment 'in such a manner as to make it a fraud or injustice not to enforce the promise' *** However, *Newton* explicitly considers common law understanding of promissory estoppel and settles on applying the four elements cited above."

¶ 64    The court proceeded to find that defendants had established "all four elements of promissory estoppel" to enforce the ADR's release of GBG's liability. The court found there was an unambiguous promise and that Daphney relied on it by entering into the Newtek loan as well as mortgaging her residence. The trial court also found such reliance was expected and foreseeable:

> "It is undisputed that one of the terms of GBG's loan agreement with Newtek was that Charles would personally assume the then outstanding balance of $210,341 on the loan from Amazing Grace to GBG * * *. It is also undisputed that Charles was the CFO of Amazing Grace at that time, and that he signed the ADR in that capacity, releasing GBG from the debt and assuming it himself. [***] It is clear from Charles' affidavit that he, and therefore Amazing Grace, was aware that the purpose of the ADR was for GBG to secure the Newtek loan. * * * Plaintiffs did not file a counter-affidavit, so the facts in Charles' affidavit are admitted and taken as true for the purposes of the motion. [Citation.] Therefore, Defendants have established the third element of promissory estoppel—their reliance on the ADR was expected and foreseeable."

¶ 65     The court's order did not discuss any evidence that Baughns (who supplied the initial money) knew of the ADR or the Newtek loan. It also did not mention Charles' deposition testimony.

¶ 66     As to the fourth element, the court also found detrimental reliance, insofar as Daphney "entered into the Newtek Loan Agreement as President of GBG, took on a personal guaranty of that debt, and signed a promissory note to Charles in reliance on the ADR." Thus, on the basis of promissory estoppel, the court granted summary judgment as to both count I (breach of the note) and count III (foreclosure of the lien).

¶ 67     The order specified that it denied summary judgment as to counts IV and V, as the parties had made no arguments regarding the Letter of Intent.

¶ 68     On May 10, 2024, plaintiffs filed a motion to reconsider the April 2024 order. Plaintiffs argued the court overlooked the equitable principle that promissory estoppel should apply if "fraud or injustice can be avoided only by enforcement of the promise." Plaintiffs denied that this was a "fifth element" to the doctrine of promissory estoppel. Rather, they argued that pursuant to *Newton*, when defendants seek to affirmatively use promissory estoppel there must be some evidence that their detrimental reliance was such "as to make it a fraud or injustice not to enforce the promise." That is, they urged promissory estoppel is limited to case where injustice can be avoided only by enforcement of the promise.

¶ 69     Plaintiffs urged that there was at least a question of fact as to whether defendants reasonably or justifiably relied on the ADR. They pointed out Charles' testimony that he only signed the document to effectuate the Newtek loan, and that he "never intended for [plaintiffs] not to be paid the money that kept us in business." Plaintiffs also pointed out the September 2019

correspondence in which Daphney and Michael-Charles (officers of GBG) acknowledged to Baughns that GBG still owed money on the 2014 loan.

¶ 70    Elsewhere in the motion to reconsider, plaintiffs argued that Daphney has not incurred "detriment" for purposes of promissory estoppel. They claimed that although she had guaranteed the Newtek loan, there was no evidence she had suffered actual monetary loss or would in fact incur financial liability.

¶ 71    On November 12, 2024, the trial court issued an order denying the motion to reconsider. The court rejected plaintiffs' suggestion that to show detriment, the promisee must show that it already suffered loss or injury, or that the promisee will suffer loss or injury unless the promise is enforced. The court explained that detriment "can be legal detriment, and need not amount to actual damages." The court concluded that defendants had shown "detriment" for purposes of that element of promissory estoppel, citing Daphney's action in providing a personal guaranty on the Newtek loan, and mortgaging her residence. The order denying the motion to reconsider did not mention deposition testimony or whether Baughns had any knowledge of the ADR.

¶ 72    In an Agreed Order filed April 16, 2025, the court recited that Charles had assigned certain of his rights to plaintiffs "for purposes of collection against" Daphney. Accordingly, plaintiffs voluntarily dismissed counts II, IV and V.

¶ 73    The court proceeded to enter a final order with respect to the entry of summary judgment in defendants' favor on counts I and III, and denial of the plaintiffs' motion for reconsideration. On May 9, 2025, plaintiffs filed a notice of appeal.

¶ 74                              II. ANALYSIS

¶ 75    On appeal, plaintiffs challenge the entry of summary judgment in defendants' favor on count I against GBG (breach of the 2014 promissory note) and count III (foreclosure of the 2014

security agreement executed in connection with the note). Plaintiffs primarily contend the trial court erred in relying on the ADR to grant summary judgment because the ADR was unenforceable for lack of consideration.

¶ 76    Alternatively, plaintiffs urge that the trial court's application of promissory estoppel to enforce the ADR's release was inconsistent with supreme court precedent (*Newton*) and section 90 of the Restatement (Second) of Contracts.  Plaintiffs suggest application of the release does not serve the equitable goals of the doctrine. Plaintiffs also urge that defendants did not incur any liabilities which "must cause them loss or injury" so as to satisfy the element of "detriment" for purposes of promissory estoppel.

¶ 77    For the following reasons, we find the record presents at least one genuine issue of material fact that precluded application of promissory estoppel to enforce the release in the ADR. Thus, we reverse and remand for further proceedings on counts I and III.

¶ 78                              Standard of Review

¶ 79    Summary judgment is proper where, when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits on file reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Illinois Founders Ins. Co. v. Williams*, 2015 IL App (1st) 122481, ¶ 30; 735 ILCS 5/2-1005 (West 2024).

¶ 80    Summary judgment is a "drastic remedy." *Council for Jewish Elderly v. Kurtz,* 2024 IL App (1st) 230102, ¶ 35. "A court must therefore be cautious in awarding summary judgment 'in order to avoid preempting a litigant's right to a trial in which the litigant may fully present the factual basis of his or her case.' " *Id.* (quoting *Schuster v. Occidental Fire & Casualty Co. of North America*, 2015 IL App (1st) 140718, ¶ 16). If the record reveals a dispute as to any material issue

of fact, summary judgment must be denied. *Id*. ¶ 36. *De novo* review applies to the entry of summary judgment. *Illinois Founders Ins. Co.*, 2015 IL App (1st) 122481, ¶ 30.

¶ 81 Here, plaintiffs sought to establish breach of the October 2014 note and security agreement, which evidenced the loan from Amazing Grace (funded by Baughns) used to save GBG. Notably, summary judgment in defendants' favor was *not* based on any alleged deficiencies with those agreements. The parties did not dispute that the 2014 loan was funded by Baughns and signed by Charles on behalf of borrower GBG. Instead, the court entered summary judgment based on its conclusion that the 2015 ADR —executed by Charles on behalf of *lender* Amazing Grace—fully released defendant's obligations to repay the debt on the 2014 loan. The trial court agreed with defendants that, by operation of promissory estoppel, the ADR was an enforceable release of defendants' obligations under the 2014 loan.

¶ 82 Alleged Lack of Consideration

¶ 83 Plaintiffs primarily argue that the ADR could not serve as a valid release because it lacked consideration. That is, it did not recite any benefit that Amazing Grace received in exchange for releasing GBG of the 2014 loan. Defendants respond that the doctrine of promissory estoppel "provide[s] the element of consideration, when it is otherwise lacking."

¶ 84 Generally, consideration is a basic requirement for a valid contract. *Arbogast v. Chicago Cubs Baseball Club, LLC*, 2021 IL App (1st) 210526, ¶ 20 (basic requirements of a contract are the existence of an offer, acceptance, and consideration). However, defendants are correct that a lack of consideration does not preclude enforcement of a promise, if the elements of promissory estoppel are otherwise met. In discussing that doctrine, our supreme court has recognized that " '[a]lthough there may be absent a bargained-for consideration, a person who makes a promise may nonetheless be bound by its terms.' " *Newton*, 233 Ill. 2d at 50 (quoting *Bank of Marion v. Robert*

*'Chick' Fritz, Inc*., 57 Ill. 2d 120, 124 (1974)). That is, "[p]romissory estoppel is a doctrine under which the plaintiff may recover without the presence of a contract." *Janda v. U.S. Cellular Corp*. 2011 IL App (1st) 103552, ¶ 88 (quoting *Newton,* 233 Ill. 2d at 53 (quoting *Illinois Valley Asphalt*, 90 Ill. App. 3d at 770)).

¶ 85        Thus, the absence of consideration for the ADR will not preclude its enforcement if promissory estoppel otherwise applies, as the trial court found in granting summary judgment. Thus, we turn to discuss that doctrine, and the plaintiffs' arguments as to why it should not apply to enforce the ADR.

¶ 86                                      Promissory Estoppel

¶ 87        As explained by our supreme court, promissory estoppel is a common law doctrine that "has been incorporated into the Restatement (Second) of Contracts as section 90." *Newton*, 233 Ill. 2d at 50. That section provides, in relevant part:

> " 'A promise which the promisor should reasonably expect to induce
> action or forbearance on the part of the promisee or a third person
> and which does induce such action or forbearance is binding if
> injustice can be avoided only by enforcement of the promise. The
> remedy granted for breach may be limited as justice requires.' " *Id*.
> (quoting Restatement (Second) of Contracts § 90(1), at 242 (1981)).

¶ 88        In *Newton*, our supreme court confirmed four elements for the doctrine to apply: "To establish a claim, the plaintiff must prove that (1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment." *Id*. at 51 (citing *Quake Construction, Inc. v. American Airlines*, 141 Ill. 2d 281, 309-10 (1990)).

¶ 89      *Newton* also recognized that, given the "equitable nature" of the doctrine, "courts may appropriately limit relief to only those damages suffered as a result of *justifiably relying* on the other party's promise." *Id.* at 58 (emphasis added). That is, reliance must be foreseeable and reasonable. This court has stated:

> "The third requirement for establishing a claim for promissory estoppel is that 'plaintiff's reliance was expected and foreseeable by defendants'. *Newton*, 233 Ill. 2d at 51 (citing *Quake*, 141 Ill. 2d at 309-310). This element can alternatively be described as demonstrating plaintiff's justifiable or reasonable reliance on the promise, similarly to the elements required in a claim for fraud."
> *Janda v. U.S. Cellular Corp.*, 2011 IL App (1st) 103552, ¶ 91 (citing *Newton*, 233 Ill. 2d at 60).

¶ 90      *Newton* recognized that "Two elements of fraud—that the plaintiff justifiably relied on the false statements of the defendant, and that the reliance caused damage—are similar to the third and fourth elements of promissory estoppel." 233 Ill. 2d at 61 (declining to determine whether the elements of fraud and promissory estoppel are identical for purposes of reviewing a grant of summary judgment). *Id*. at 61. In the fraud context, the existence of reasonable reliance is a generally a question of fact. See *Siegel Development, LLC v. Peak Construction LLC*, 2013 IL App (1st) 111973, ¶ 114 ("Generally, the question of whether a plaintiff's reliance was reasonable is a question of fact;  however, where only one conclusion can be draw from the undisputed facts, the question becomes one for the court to determine.")

¶ 91      In this case, defendants relied on promissory estoppel to enforce the release in the ADR. The parties do not dispute that the ADR contained an "unambiguous promise," or that there was

*some* reliance by defendants. Rather, they dispute *the nature* of that reliance. Plaintiffs' contentions on appeal can be summarized as follows: (1) given the circumstances, it would be inequitable to find that defendants justifiably relied on the release in the ADR; (2) the purported reliance by Daphney was not "detrimental" within the meaning of the doctrine because Daphney did not show she has or will suffer any monetary loss. We believe the first point merits reversal and remand.

¶ 92                     There Are Questions of Fact as to Justifiable Reliance

¶ 93      In this case, the promise was the release contained in the ADR (signed on behalf of Amazing Grace by Charles but not Baughns). There is little doubt that defendants GBG and Daphney relied on that release to effectuate a number of documents related to the Newtek loan to GBG, including Daphney's guaranty of the Newtek loan and her mortgage on her personal residence in connection with the Newtek loan.

¶ 94      However, that does not mean defendants' reliance on the release was *justifiable*, such that equity demands enforcement of the ADR. To the contrary, the record raises questions as to whether GBG or Daphney could reasonably or justifiably rely on Charles' execution of the release on behalf of Amazing Grace, purporting to release GBG's loan obligation of more than $200,000 (with no cited consideration). Given the record evidence regarding the convoluted series of transactions involved, there is at least a genuine issue of fact as to whether promissory estoppel can be equitably applied.

¶ 95      In assessing whether GBG could reasonably rely on the ADR's purported release of the 2014 loan, perhaps the most immediate glaring cause for concern is that Charles acted on both sides of the transactions at issue. That is, in October 2014 he signed the promissory note *on behalf of the borrower*, GBG. Less than one year later, he signed the ADR *on behalf of the lender* Amazing Grace, purporting to release GBG from any liability. In the same document, Charles

acknowledged that he personally was "indebted to the Creditor [Amazing Grace] in the amount of $210,341."

¶ 96    On its face, we think any reasonable person would question why the same individual who acted on behalf of a borrower (GBG) to get a large loan would subsequently sign a release on behalf of the lender (Amazing Grace). This is especially so, since the ADR did not specify any consideration that Amazing Grace would receive in exchange for the release.

¶ 97    The evidence regarding Baughns' role in the underlying loan also undermines the notion that defendants could reasonably rely on the release in the ADR. Undisputed evidence shows that, although the loan document identified Amazing Grace as the lender, Baughns funded the loan to GBG, at the request of her then-husband, Charles.  We recognize Daphney's sworn statement that, at the time, she did not know Baughns was the source of the loan. That assertion is corroborated by Charles' deposition testimony.

¶ 98    However, it is evident that GBG (through its officer, Charles) knew that Baughns funded the loan: indeed, it was Charles who solicited her to do so. We note the general principle that the knowledge of a corporation's officer is imputed to the corporation. See *People ex rel. Daley v. Warren Motors, Inc.* 114 Ill. 2d 305, 320 (1986); see also *McRaith v. BDO Seidman, LLP*, 391 Ill. App. 3d 565, 589 (2009) ("Generally, the knowledge and conduct of agents are imputed to their principals. [Citation.] An exception to this rule exists where the agent's interests are adverse to the principal. [Citation.]").[3]

¶ 99    The record indicates that when he signed the ADR on behalf of Amazing Grace in August 2015, Charles may have still been an officer of GBG. If so, Charles' knowledge would presumably

---

[3] We recognize that the record raises another potential factual question as to whether Charles was acting on behalf of himself or on GBG's behalf.

be imputed to GBG at that time. This begs the question: How could GBG reasonably rely on the release in the ADR when Charles knew that it said nothing about repaying Baughns, the source of the 2014 loan funds?

¶ 100    We also think it significant that Charles testified that, when he signed the ADR, he did *not* think it would preclude Baughns from being repaid. To the contrary, Charles testified that he would not have signed the ADR if he believed it would prevent her from being paid. This certainly raises concerns about whether it would be just or equitable to enforce the ADR.

¶ 101    We recognize defendants' argument that Charles' deposition testimony should be disregarded, citing the general principle that parol evidence may not be used to vary a contract unless there is an ambiguity in a contract. See *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462-63 (1999). Defendants argue that the ADR is unambiguous and thus Charles' deposition testimony cannot be considered. But the parol evidence principle is inapplicable, since defendants do not assert that the ADR is a contract. Rather, they seek to rely on the doctrine of promissory estoppel, which applies in the absence of a contract. Thus, Charles' deposition testimony is evidence that should be considered in deciding whether there is an issue of fact as to the element of justifiable reliance.

Moreover, the notion that defendants reasonably relied on the ADR as a valid release of the 2014 debt is also undermined by the evidence that in 2019, two of GBG's officers (Daphney and Michael-Charles) explicitly acknowledged the validity of the debt and promised to repay it. Indeed, Michael-Charles (an officer of GBG) apologized to Baughns and wrote a number of checks in late 2019 attempting to make payments on the debt, before this action was commenced. It is hard to see how GBG or Daphney can claim they justifiably relied on the 2015 ADR as a release of the Amazing Grace debt, when they explicitly acknowledged the debt was still valid in 2019.

At the very least, the evidence presents an issue of fact as to whether their reliance on the ADR was justifiable.

¶ 102 We keep in mind the "equitable nature" of promissory estoppel. *Newton*, 233 Ill. 2d at 57. Given the evidence that defendants acknowledged the validity of the debt to plaintiffs years after the ADR, we do not see how it is equitable to use promissory estoppel to relieve defendants of their debt.

¶ 103 We thus find that there is at least one genuine issue of material fact that should have precluded summary judgment for defendants on the ground of promissory estoppel. On this basis, we reverse the grant of summary judgment, as well as the denial of plaintiffs' subsequent motion for reconsideration, and remand for further proceedings.

¶ 104 We note that because a genuine factual issue exists regarding the promissory estoppel element of reasonable reliance, we need not discuss the merits of plaintiffs' alternative argument that Daphney did not suffer "detriment" within the meaning of case law describing that element. Likewise, we need not address the defendants' contentions as to whether the disparity between the face amount of the promissory note ($272,799.90) and the amount actually transferred from Baughns ($219,000) renders the note partially unenforceable due to lack of consideration, or if that difference otherwise limits the potential damages recoverable for its breach. Such issues can be addressed, if necessary, on a fuller record before the trial court on remand.

¶ 105 Similar Questions Preclude Summary Judgment with Respect to Count III

¶ 106 We recognize that the circuit court granted summary judgment in favor of defendants not only with respect to count I (breach of the note) but also with respect to count III, foreclosure of Amazing Grace's lien. Apart from its discussion of promissory estoppel, the circuit court order did not specify any independent reason for summary judgment on count III.

¶ 107    As pointed out in plaintiffs' opening brief, defendants' motion for summary judgment urged reliance on the August 2015 Subordination Agreement with respect to count III. They argued in that motion that the Subordination Agreement "works to place [Amazing Grace] in second place in line behind [Newtek]" until the Newtek lien is paid in full, such that "[u]ntil the priority lien held by Newtek Finance is released the Court must deny [Amazing Grace]'s foreclosure of the lien."

¶ 108    Notably, defendants' appellee brief makes no argument regarding count III or the Subordination Agreement. However, we think it is apparent that there are issues of fact regarding the enforceability of that agreement for the reasons discussed with respect to the ADR. As with the ADR, the Subordination Agreement was executed on behalf of Amazing Grace by Charles, apparently without Baughns' knowledge. On the record before us, we cannot conclude that the Subordination Agreement warrants judgment in defendants' favor on count III.

¶ 109    Before we conclude, we reiterate that promissory estoppel with respect to the ADR was the sole basis on which the court entered summary judgment on both counts I and III. In reversing, we do not mean to hold that the ADR is necessarily unenforceable. Nor do we suggest that plaintiffs will ultimately be able to prevail. However, keeping in mind that promissory estoppel is an equitable doctrine requiring justifiable reliance, we find there are certainly genuine questions of fact that must be resolved. We reiterate it is undisputed that plaintiff Baughns liquidated her retirement savings to fund the loan that kept GBG in business, a loan which defendants acknowledged was unpaid and owing years *after* the ADR. Further, Baughns apparently had no knowledge of the ADR when Charles signed it. Certainly, there are questions that must be resolved before it can be found that equity warrants using promissory estoppel to enforce the ADR's release of the underlying debt.

¶ 110                                    CONCLUSION

¶ 111         For the foregoing reasons, we reverse the circuit court's entry of summary judgment in

favor of defendants and remand for further proceedings on counts I and III.

¶ 112         Reversed and remanded.